# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SIMON MUJO and INDRIT MHARREMI, on
behalf of themselves and all others similarly
situated,
     Plaintiffs,

v.

JANI-KING INTERNATIONAL, INC.,
JANI-KING INC., and JANI-KING OF
HARTFORD, INC.,
     Defendants.

No. 3:16-cv-1990 (VAB)

## RULING ON DEFENDANT'S MOTION TO DISMISS

Simon Mujo and Indrit Muharremi, on behalf of a putative class of over 100 Jani-King

franchisees (collectively "Plaintiffs"), have sued Jani-King International, Inc., Jani-King, Inc.,

and Jani-King of Hartford, Inc. (collectively "Jani-King"). In this diversity action, Mr. Mujo and

Mr. Muharremi allege that Jani-King has unlawfully classified them as independent contractors

under Connecticut Wage Laws, Conn. Gen. Stat. § 31-58 *et seq.*, and that the various fees, costs,

client sales tax, and charge backs under Jani-King's franchise agreement violate Sections 31-

71(e) and 31-73(b) of the Connecticut General Statues.

Jani King now moves to dismiss Plaintiffs' class-action complaint.

For the reasons that follow, Jani-King's motion to dismiss is **GRANTED** in part and

**DENIED** in part.

Even if the parties' franchisor-franchisee agreement constitutes an employment

agreement, any deductions for royalty fees, advertising fees, finder's fees, accounting fees,

technology fees, complaint fees, services fees, non-reported business fees, client sales tax, lease

deductions, and various other fees do not constitute "wages" within the meaning of Conn. Gen. Stat. § 31-71e and thus, Plaintiffs' claim under Conn. Gen. Stat. § 31-71e must be dismissed.

Nevertheless, any initial and non-refundable franchise fee down payment made or continuing to be paid by Plaintiffs or any of the various other fees required from Plaintiffs may, if proven to be a condition for Jani-King providing them with initial or continuing employment, constitute an improper payment in violation of § 31-73(b). As a result, Plaintiffs' unjust enrichment claim survives and Jani-King's motion to dismiss this claim is denied.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Factual Allegations

Jani-King provides commercial cleaning services to its customers.[1] Am. Compl. ¶ 15. Jani-King franchisees, two of whom are Mr. Mujo and Mr. Muharremi, conduct these cleaning services. *Id.* To carry out their business, Jani-King, under the terms of a franchise agreement ("Agreement"), allegedly enters into independent contractor relationships with individuals who then perform janitorial work for Jani-King customers. *Id.* Jani-King allegedly required all members of the putative class to sign substantially similar agreements before working for Jani-King. *Id.* ¶ 16.

Under the terms of these agreements, Jani-King allegedly required Plaintiffs to pay an initial and non-refundable franchise fee down payment, as a condition for Jani-King providing them with the opportunity to perform cleaning services under Jani-King's cleaning contracts

---

[1] Jani-King International, Inc., owns Jani-King, Inc., which, in turn, owns Jani-King of Hartford, Inc., all of whom are incorporated and maintain their principal place of business Addison, Texas. Am. Compl. ¶ 4–6, ECF No. 41.

between Jani-King and their customers.[2] *Id.* ¶ 17. Mr. Mujo and Mr. Muharremi and a subset of the putative class members allegedly paid the down payment to Jani-King as a lump sum at the time of entering into the contract. *Id.* A second subset of putative class members allegedly paid a portion of the down payment at the time of entering into the contract and paid or are paying the outstanding balance as monthly deductions drawn from the compensation paid to them by Jani-King. *Id.*

### 1. Freedom from Control and Direction Allegations

Plaintiffs allege that they are not free from Jani-King's control and direction with respect to Plaintiffs performance of services, under the terms of the Agreement. *Id.* ¶ 20. Plaintiffs also maintain that Jani-King's methods, procedures, and policies with which Jani-King requires Plaintiff to comply "are numerous and detailed and control the manner in which Plaintiffs and the putative class members must perform their tasks." *Id.*

For example, the franchise agreement allegedly requires that Plaintiffs complete a training program including an exam; comply with the Jani-King Manual, which, among other things, requires Plaintiffs to: abide by Jani-King's operating systems, procedures, policies, methods, standards, specifications, and requirements; wear a Jani-King uniform and nametag; obtain a personal digital assistant or smart phone to use when corresponding with Jani-King and

---

[2] On July 11, 2007, Mr. Mujo allegedly entered into a franchising agreement ("Mujo Agreement") with Jani-King. Am. Compl. ¶ 2, ECF No. 41. The agreement allegedly required an initial down payment and finder's fee, totaling $44,175. Mujo Agreement at 1, Defs.' Br., Ex. B, ECF No. 45-3. Mr. Mujo stopped performing cleaning services for Jani-King in 2016. Compl. ¶ 2.
    Mr. Muharremi allegedly entered into a separate franchising agreement ("Muharremi Agreement") with Jani-King on April 23, 2014, on behalf of his limited liability company, Luli & Son, LLC. Compl. ¶ 3. The Muharremi Agreement allegedly required Luli & Son, LLC, to pay an initial down payment of $16,250. Muharremi Agreement at 1, Defs.' Br., Ex. A, ECF No. 45-2. Mr. Muharremi is still an active franchisee of Jani-King. Compl. ¶ 3.

its customers; communicate with customers in a certain way and on a schedule Jani-King determines; perform services consistent with a cleaning schedule associated with the contract between Jani-King and its customers; and allow Jani-King to perform quality control inspections to ensure compliance with Jan-King standards. *Id.* ¶ 20.

The Agreement allegedly prohibits franchisees from engaging in or having a financial interest in other cleaning services within the territory covered by the Agreement. *Id.* Indeed, the Agreement allegedly contain a non-compete clause that prohibit Plaintiffs from engaging in any cleaning service-related work during the term of the Agreement and for two years after its termination. *Id.* ¶ 22.

Plaintiffs also allegedly do not perform services outside of the usual course of Jani-King's business or outside of all Jani-King's places of business. *Id.* ¶ 21. Indeed, Plaintiffs are allegedly "entirely dependent" upon Jani-King for their work assignments, and Plaintiffs do not and, under the terms of the Agreement, cannot maintain their own clients or customers. *Id.*

### 2. Wage Deductions

Plaintiffs also maintain that Jani-King deducts monthly various sums of money from their wages, including royalty fees, advertising fees, finder's fees, accounting fees, technology fees, complaint fees, services fees, non-reported business fees, client sales tax, lease deductions, and various other fees. *Id.* ¶ 23.

For example, in September 2016, Mr. Muharemmi allegedly earned a net revenue of $4,508.72. *Id.* ¶ 24. From this amount, Jani-King allegedly deducted: (1) a royalty fee of $425.75; (2) an accounting fee of $127.72; (3) a technology fee of $106.44; (4) a finder's fee of $162.42; (5) franchisee supplies costs in the amount of $49.98; (6) an advertising fee of $63.86; (7) a lease cost in the amount of $27.21; (8) a business protection plan ("BPP") deduction of

$276.73; (9) a "BPP" administrative fee of $7.00; (10) client sales tax in the amount of $251.30; and (11) charge backs in the amount of $1,261.50. *Id.* In total, Jani-King allegedly deducted $2,761.90 from Mr. Muharremi's compensation, leaving him with $1,746.80 in gross income for the month *Id.*

During July 2015, Mr. Mujo allegedly earned $1,403.83 in revenue. *Id.* ¶ 25. From that amount, Jani-King allegedly deducted: (1) a royalty fee in the amount of $132.00; (2) an accounting fee of $66.00; (3) a finder's fee in the amount of $714; (4) an advertising fee of $13.20; (5) a business protection plan deduction of $77.35; (6) a business protection administration fee of $7; and (7) client sales tax in the amount of $83.83. *Id.* In total, Jani-King allegedly deducted $1,093.38 from Mr. Mujo's compensation, leaving him with $310.45 gross income. *Id.*

Jani-King allegedly has made these deductions without obtaining a knowing and intelligent authorization for those deductions on a form approved by the Commission of the Department of Labor, as allegedly required under Section 31-71e of the Connecticut General Statutes. *Id.* ¶ 26. Plaintiffs maintain that the Agreement does not constitute written authorization, as required under Connecticut law, because, at the time of execution, Jani-King represented to Plaintiffs that they were not Jani-King's employees and Jani-King was not their employer within the meaning of the Connecticut Minimum Wage Act ("Minimum Wage Act"). *Id.* Plaintiffs alleged that these deductions were solely for Jani-King's benefit and did not confer a benefit on Plaintiffs. *Id.*

### 3. Class Allegations

Plaintiffs allege that the putative class members are similarly situated "individuals in Connecticut who, pursuant to a contract with Jani-King, have performed cleaning services for

Jani-King at any time during the two years immediately preceding this lawsuit and continuing until final judgment of the case." *Id.* ¶ 29. The putative class is allegedly so numerous that joinder of all parties is impracticable, given that more than fifty individuals in Connecticut meet the class definition. *Id.* ¶ 32.

Plaintiffs allege that there are common questions of law and fact, including whether: (1) Jani-King has improperly categorized Plaintiffs as independent contractors; (2) the wage deductions under the Agreement were lawful; (3) the down payment and wage deductions Jani-King required violate Section 31-73 of the Minimum Wage Act; and (4) whether Jani-King was thereby unjustly enriched. *Id.*

Plaintiffs' claims are allegedly typical of the class in that the claims are identical and arise from the same course of conduct and practice. *Id.* ¶ 34. Mr. Mujo and Mr. Muharremi allege that they will fairly and adequately protect the interests of the class and that common questions of law and fact predominate over questions affecting only individual members. *Id.* ¶ 35–36. Plaintiffs allege that, because Plaintiffs will prove their claims by a common body of evidence, a class action is superior to other available methods for the fair and efficient adjudication of this matter. *Id.* ¶ 36.

### B.    Procedural Background

Plaintiffs filed this lawsuit on December 5, 2016, and, on February 9, 2017, filed an Amended Complaint alleging two counts: (1) Jani-King has violated the Minimum Wage Act; and (2) Jani-King has been unjustly enriched. ECF Nos. 1, 41.

Plaintiffs seek: (1) injunctive relief; (2) compensatory damages under the Minimum Wage Act; (3) penalty damages under Section 31-72 of the Connecticut General Statutes; (4) attorney's fees as appropriate under Section 31-72 of the Connecticut General Statutes; (5)

common law punitive damages; (6) disgorgement; (7) and interest and costs. *Id.* at 14. The Court

has jurisdiction under 28 U.S.C. § 1332. Defendants move to dismiss the Amended Complaint

for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Mot. to Dismiss. ECF

No. 45.

## II.      STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon

which relief can be granted," Fed. R. Civ. P. 12(b)(6), must be dismissed. In reviewing a

complaint under Rule 12(b)(6), a "plausibility standard" is applied, guided by "two working

principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of

the elements of a cause of action will not do." (internal citations omitted)). Second, "only a

complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at

679. Thus, a complaint must contain "factual amplification . . . to render a claim plausible."

*Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*,

589 F.3d 542, 546 (2d Cir. 2009)).

At this stage, all of the factual allegations in the complaint must be accepted as true.

*Iqbal*, 556 U.S. at 678. And the factual allegations in the complaint must be viewed in the light

most favorable to the plaintiff, drawing all inferences in favor of the plaintiff. *Cohen v. S.A.C.*

*Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true."), *cert. denied*, 537 U.S. 1089 (2002).

Courts considering motions to dismiss under Rule 12(b)(6) generally limit its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The court, however, may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III.    DISCUSSION

Plaintiffs argue that an employer may not classify workers as independent contractors, unless the employer satisfies the applicable test under Conn. Gen. Stat. § 31-222(a)(1)(B). Without this showing, Plaintiffs argue that Jani-King has unlawfully categorized them as independent contractors and illegally made deductions from Plaintiffs' wages and unjustly enriched itself. Jani-King argues that the Connecticut Franchise Act (the "Franchise Act") provides its own protections to franchisees and that agreements entered into under the authority of the Franchise Act are fundamentally at odds with Plaintiffs' contention that Jani-King is an employer under Conn. Gen. Stat. § 31-222. Jani-King also argues that Plaintiffs' theories of liability would have catastrophic consequences for the franchise business model in its entirety.

The Court first addresses the threshold question of whether the franchisees of a business can be considered employees, rather than independent contractors, under Connecticut law. If they can be considered employees, at least at this stage of the case, the Court then must determine whether any deductions made from the pay of the Plaintiffs would violate Conn. Gen. Stat. § 31-71e. While the issue of whether the franchisees can be considered employees cannot be resolved at this stage, the Court nevertheless determines that Jani-King's deductions, with the exception of the down payment, do not constitute wages within the meaning of Conn. Gen. Stat. § 31-71e and thus, Plaintiffs' claim under Conn. Gen. Stat. § 31-71e must be dismissed.

Plaintiffs claim for unjust enrichment, however, survives. While Section 31-73 of the Minimum Wage Act does not provide a private right of action, Connecticut law recognizes that the payments alleged here may violate public policy, which would make any underlying agreement for these payments void. Plaintiffs' unjust enrichment claim therefore remain viable, at least for now.

### A.     Applicability of the Employee Status Test to Franchise Agreements

Plaintiffs contend that they are, as a matter of law and fact, "employees" under Conn. Gen. Stat. § 31-222. Pls.' Sur Reply Br. at 4. Jani-King contends that there is no way to harmonize the necessary control required under a franchise agreement with the elements of the applicable test governing the employer-employee relationship. Defs.' Reply Br. at 2. The Court disagrees.

Under Connecticut law, subject to rebuttal, the provision of services by an individual is, presumptively employment. *Standard Oil of Connecticut, Inc. v. Adm'r, Unemployment Comp. Act*, 134 A.3d 581, 586 (Conn. 2016) ("Because the provision is in the conjunctive, the party

claiming the exception to the rule that the service is employment must show that all three prongs of the test have been satisfied." (citation omitted)). The Minimum Wage Act provides:

> Service performed by an individual shall be deemed to be employment . . . unless and until it is shown . . . that (1) such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; and (II) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and (III) such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed . . . .

Conn. Gen. Stat. § 31-222(a)(1)(B)(ii). The statute includes a lengthy list of services excluded from "employment" within the meaning of the Minimum Wage Act. *See, e.g.*, Conn. Gen. Stat. § 31-222(a)(5)(A) (providing that "services performed by an individual in the employ of such individual's son, daughter or spouse, and services provided by a child under the age of eighteen in the employ of such child's father or mother" are exempted subject to record keeping requirements).

The Franchise Act exists in a separate chapter of the Connecticut General Statutes and requires a different inquiry to determine whether a franchise-franchisee relationship exists. The statute defines "franchise" as

> an oral or written agreement or arrangement in which (1) a franchisee[3] is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor[;] . . . and (2) the operation of the franchisee's business . . . is substantially

---

[3] "'Franchisee' means a person to whom a franchise is granted . . . authority under a franchise to use a trademark, tradename, service mark or other identifying symbol or name." Conn. Gen. Stat. § 42-133e(d).

> associated with the franchisor's[4] trademark, service mark, trade
> name, logotype, advertising or other commercial symbol
> designating the franchisor . . . a retailer . . . .

Conn. Gen. Stat. § 42-133e(b) (footnotes added). The remedial purpose of the Franchise Act—

*i.e.*, "to prevent a franchisor from unfairly exerting economic leverage over a franchisee"—

indicates the statute should be read liberally construed in favor of the class sought to be

benefited. *Hartford Elec. Supply Co. v. Allen-Bradley Co.*, 250 Conn. 334, 345 (1999). Under the

Franchise Act, by definition, a franchisor has a substantial level of control over the franchisee.

The Connecticut Supreme Court has identified factors relevant to determining "whether the

alleged franchisee conducted its business under a marketing plan substantially prescribed by the

alleged franchisor are whether the franchisor had control over the hours and days of operation,

advertising, lighting, employee uniforms, prices, hiring of staff, sales quotas and management

training." *Edmands v. CUNO, Inc.*, 277 Conn. 425, 440 (2006) (citing *Hartford Elec.*, 250 Conn.

at 350). The court also has considered "whether the alleged franchisor provided the franchisee

with financial support and had the right to audit its books or to inspect its premises." *Hartford*

*Elec.*, 250 Conn. at 350.

This list is not exhaustive. There is no precise formula as to how many of these factors

must be present to find the level of control indicative of a franchise. *Petereit v. S.B. Thomas,*

*Inc.*, 63 F.3d 1169, 1180 (2d Cir. 1995) (citing *See Sorisio v. Lenox, Inc.*, 701 F. Supp. 950, 960

(D. Conn.), *aff'd,* 863 F.2d 195 (2d Cir.1988) (per curiam). "When present to a sufficient degree,

however, these factors reflect that the franchisor has deprived the franchisee of the right to

exercise independent judgment in conducting its business." *Edmands*, 277 Conn. at 440 (citing

---

[4] "'Franchisor' means a person who grants a franchise to another person . . . the authority to use a
trademark, tradename, service mark or other identifying symbol or name under a franchise . . . ."
Conn. Gen. Stat. § 42-133e(c).

Petereit, 63 F.3d at 1181; *Aurigemma v. Arco Petroleum Products Co.*, 698 F. Supp. 1035, 1040 (D. Conn. 1988)).

Nothing in the text or the purpose of either the Minimum Wage Act or the Franchise Act, however, would preclude the application of the relevant independent contractor test under § 31-222 to the franchisor-franchisee relationship. "[T]he starting point for interpreting a statute is the language of the statute itself . . . ." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). The express exclusion from § 31-222 of certain services supports this conclusion. *See, e.g.* § 31-222(a)(1)(O)(iv) ("The operator [of an escort motor vehicle] is treated as an independent contractor for all purposes, including, but not limited to, federal and state taxation, workers' compensation, choice of hours worked and choice to accept referrals from multiple entities without consequence . . . .").

Jani-King has not cited nor has the Court identified any Connecticut decisions precluding application of the independent contractor test to a franchise agreement. "[Section 31-222] makes no express exemption for franchises, nor can [the Court] imply an exemption, particularly when, as is the case here, the legislature has created numerous exemptions from coverage under the act." *Jason Roberts, Inc. v. Adm'r*, 127 Conn. App. 780, 787 (2011). Absent express statutory language to the contrary or any textual ambiguity, §§ 31-222 and 42-133e should not be presumed to be inimical to one another. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (citation omitted).

Indeed, in *Jason Roberts*, the Connecticut Appellate Court considered whether an independent business with a license to deal the products of another company was an "employee" of that company within the meaning of the Minimum Wage Act. 127 Conn. App. at 782.

Applying Section 31-222's test, the court ruled in the affirmative, finding that the licensor was liable for unemployment compensation contributions with regard to the licensor. *Id.* at 788.

There, the licensed dealer agreement provided:

> [T]he [licensor] would do all of the scheduling when a job was sold on its contract; [the licensee] had to contact the [the licensor] on a daily basis for a status report on each job; [the licensee] had to purchase the [licensor's] uniforms and wear the uniform each day; the [licensor] retained the right to cancel the agreement if [the licensee] engaged in certain conduct, which included, inter alia, use of drugs, use of alcohol during the workday, intoxication on the job, continued absence or tardiness, failure to meet installation goals and insubordination; [the licensee] had to notify the [licensor] one hour prior to his normal arrival time if he was to be absent on that day; [the licensee] had to lease a truck from the [licensor] and was required to maintain the truck, which included waxing the exterior of the vehicle and cleaning the interior of the vehicle; and [the licensee] could not compete, directly or indirectly, with the [licensor] for the term of the agreement and for a period of two years thereafter.

*Id.* at 782–83.

As in *Jason Roberts*, Jani-King argues "that a finding that a franchise agreement exists between the parties [would] exempt[] the relationship from the purview of the [CMWA]." *Id.* at 787. But in *Jason Roberts*, while the court recognized that franchises are business arrangements that "can differ in many ways from a traditional employment relationship," the court nonetheless ruled that it must "construe and apply the statute as [the court found] it, without reference to whether [the court thinks] it would have been or could be improved by the inclusion of other provisions." *Id.* at 788 (citation omitted).

Because Connecticut law does not foreclose the possibility of a franchisee also being an employee, the issue then turns to whether Plaintiffs' factual allegations under Section 31-22 are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). The answer is yes.

Jani-King's methods, procedures, and policies "are numerous and detailed and control the manner in which Plaintiffs and the putative class members must perform their tasks." Am. Compl. ¶ 20. The applicable franchise agreement allegedly requires that Plaintiffs: complete a training program including an exam; comply with the Jani-King policy manual; wear a Jani-King uniform and nametag; obtain a personal digital assistant device; communicate with customers in a certain way and on a schedule Jani-King determines; perform services consistent with a cleaning schedule associated with the contract between Jani-King and its customers; and allow Jani-King to perform quality control inspections to ensure compliance with Jan-King standards. *Id.* ¶ 20.

Plaintiffs allegedly also do not perform services outside the usual course of Jani-King's business or outside of all Jani-King's places of business. *Id.* ¶ 21. Finally, Plaintiffs further allege that they are not customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the services they performed under the Agreement. *Id.* ¶ 22.

These allegations are sufficient to state a claim under § 31-222. *See, e.g.*, *Jason Roberts*, 127 Conn. App. at 787, ("Having applied this law to the extensive facts found, the [Employment Security Board of Review] properly determined that the [the licensor] failed to satisfy all of the prongs of the ABC test and, consequently, that [the licensee] was an employee.").

### B.    Count One: Unlawful Wage Deductions

While, at this stage, the Court cannot and should not determine whether Plaintiffs are employees within the meaning of the Minimum Wage Act, the Court nevertheless can determine the validity of Plaintiffs' claim of the improper deduction of wages, if Plaintiffs are employees. Plaintiffs argue that Jani-King took deductions from their wages for royalty fees, advertising

fees, finder's fees, accounting fees, technology fees, complaint fees, services fees, non-reported business fees, client sales tax, and lease deductions after they were earned, Pls.' Opp. Br. at 7, ECF No. 50, and that these deductions violated Conn. Gen. Stat. § 31-71e. *Id.* Jani-King argues that the various deductions Jani-King withheld from Plaintiffs do not constitute wages under the Minimum Wage Act. The Court agrees.

Under the Minimum Wage Act, a wage is "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation." Conn. Gen. Stat. § 31-71a(3). Section 31-71e of the Act governs wage withholdings, providing, in relevant part:

> No employer may withhold or divert any portion of an employee's wages unless (1) the employer is required or empowered to do so by state or federal law, or (2) the employer has written authorization from the employee for deductions on a form approved by the commissioner, or (3) the deductions are authorized by the employee, in writing, for medical, surgical or hospital care or service, without financial benefit to the employer . . . .

The Act also instructs that "[n]o employer . . . shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person. . . deduction [] necessary to secure employment or continue in employment." Conn. Gen. Stat. § 31-73(b).

In *Mytych v. May Department Stores Co.*, 260 Conn. 152 (2002), the Connecticut Supreme Court ruled that the Minimum Wage Act does "not provide substantive standards as to how wages are calculated. [Its] purpose is remedial; to prevent the employer from taking advantage of the legal agreement that exists between the employer and the employee." *Id.* at 160–61. Simply put, "the formula by which an employee's wage is calculated is determined by the agreement between the employer and the employee." *Id.* at 160.

As a result, the Connecticut Supreme Court in *Mytych* rejected a wage claim under Section 31-71, where the employer entered into a commission agreement with the plaintiffs, which provided that the plaintiffs' wages were based on a certain percentage of gross sales. *Id.* at 154–55. The agreement defined gross sales with consideration to a number of factors, including, for example, any applicable customer or employee discount, identified returns, and unidentified returns. *Id.* at 156.

In their lawsuit, the plaintiffs did not claim that the employer failed to pay them their earned wages as calculated under the commission agreement; rather, they argued that the calculation the employer used was an illegal refund or deduction from their earned wages under §§ 31-71e and 31-73(b). *Id.* at 156. But the commission agreement provided that the plaintiffs' wages were to be calculated after the deduction for unidentified returns, and therefore, the deductions themselves were not, as a matter of law, wages within the meaning of the Minimum Wage Act. *Id.* at 166.

Even more recently, the Connecticut Supreme Court in *Geysen v. Securitas Sec. Services USA, Inc.*, 322 Conn. 385 (2016), addressed whether an at-will employment agreement providing that an employee's commissions would not be paid, unless the employer had invoiced commissionable amounts to the client prior to the employee's termination, violated the Minimum Wage Act.[5] *Id.* at 387–88. "Because the plaintiff was not due his commissions under the express

---

[5] Section 31–72 of the Connecticut General Statutes provides: "When any employer fails to pay an employee wages in accordance with the provisions of sections 31–71a to 31–71i, inclusive, or fails to compensate an employee in accordance with section 31–76k or where an employee or a labor organization representing an employee institutes an action to enforce an arbitration award which requires an employer to make an employee whole or to make payments to an employee welfare fund, such employee or labor organization shall recover, in a civil action, (1) twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, or (2) if the employer establishes that the employer had a good faith belief that the

and enforceable terms of his agreement with the defendant, and the agreement does not violate public policy," *Geysen*, 322 Conn. at 398, the Minimum Wage Act had not been violated.

Here, Plaintiffs have not alleged that the employer failed to pay them their earned wages, as calculated under the Agreement. Instead, Plaintiffs seek as "wages" amounts deducted from their pay under the franchisor-franchisee agreement. *See, e.g.*, Luli & Son LLC, Franchise Agreement, Defs.' Br. Ex. A at 6, ECF No. 45-2 ("Franchisee agrees to pay to Franchisor . . . a royalty fee equal to 10% of the monthly Gross Revenue."). Plaintiffs argue that the calculation the employer used was an illegal refund or deduction from their earned wages under §§ 31-71e. *See, e.g.*, Am. Compl. ¶ 26 ("Defendants have taken said deductions from Plaintiff's wages without obtaining an[] intelligent written authorization for those deductions . . . .").

Because all of these deductions, except for any related to a down payment, are expressly provided for in the agreement between Plaintiffs and Defendants, these deductions do not constitute "wages" within the meaning of the Minimum Wage Act. *See Mytych*, 260 Conn. at 164 (recognizing that the definition of "wages" under § 31-71a(3) "leaves the determination of the wage to the employer-employee agreement, assuming some specific conditions, such as a minimum hourly wage, are met.").

At oral argument, Plaintiffs nevertheless argued that these deductions, wholly consistent with the parties' franchisor-franchisee agreement, violate § 31-71a(3) because the parties' agreement should be rendered void as a matter of public policy. The Court disagrees.

---

underpayment of wages was in compliance with law, the full amount of such wages or compensation, with costs and such reasonable attorney's fees as may be allowed by the court. Any agreement between an employee and his or her employer for payment of wages other than as specified in said sections shall be no defense to such action . . . ."

In essence, Plaintiffs construe § 31-71a(3) as conferring substantive rights and not just remedial rights. Connecticut law, as discussed above and further discussed below, is to the contrary. *See, e.g.*, *Capuano v. Island Computer Prod., Inc.*, 382 F. Supp. 2d 326, 346–47 (D. Conn. 2005) ("*Mytych*, in stating that 'our wage payment statutes expressly leave the timing of accrual to the determination of the wage agreement between the employer and employee,' . . . emphasized that the [Connecticut] wage statutes [are] remedial, not substantive, and that the terms of the employee wage agreement should be honored." (quoting *Mytych*, 260 Conn. at 165)).

The Connecticut Supreme Court's decision in *Geysen* made clear that: "There is a strong public policy in Connecticut favoring freedom of contract . . . . This freedom includes the right to contract for the assumption of known or unknown hazards and risks that may arise as a consequence of the execution of the contract. Accordingly, . . . a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability . . . . If a contract violates public policy, this would be a ground to not enforce the contract. . . . A contract . . . however, does not violate public policy just because the contract was made unwisely . . . [C]ourts do not unmake bargains unwisely made." *Geysen*, 322 Conn. at 392–93 (quoting *Schwartz v. Family Dental Grp., P.C.*, 106 Conn. App. 765, 772–73 (2008)).

Indeed, in *Geysen*, under the principle that "the formula by which an employee's wage is calculated is determined by the agreement between the employer and the employee" and that in light of the public policy embodied and § 31-71a and the freedom of contract "determination of

the wage [is left to] to the employer-employee agreement," the court ruled in favor of the employer. *Id.* at 394 (citing *Mytych*, 260 Conn. at 163).

Connecticut law also embraces the principle that "all employer-employee relationships not governed by express contracts involve some type of implied 'contract' of employment." *McAllister v. East*, 611 Fed. App'x 17, 19 (2d Cir. 2015) (internal citation omitted) (quoting *Torosyan v. Boehringer Ingelheim Pharm., Inc.*, 234 Conn. 1, 13 (1995)). This Court therefore "must enforce the contract as drafted by the parties and may not relieve [Plaintiffs] from anticipated or actual difficulties undertaken pursuant to the contract." *Geysen*, 322 Conn. at 392.

Because the various fees deducted from Plaintiffs' compensation were provided for in the franchisor-franchisee agreement entered into by the parties, Plaintiffs' claim for relief under § 31-71e fails as a matter of law.[6]

However, as discussed further below, even if these fees are not wages under § 31-71e, *Mytych* leaves open the possibility that that the fees and deductions required under the Agreement may nonetheless violate public policy.

### C.    Count Two: Unjust Enrichment

Alternatively, Plaintiffs seek relief under § 31-73(b). Jani-King allegedly requires Plaintiffs both to pay fees on an ongoing basis, and to pay an initial and non-refundable, franchise-fee down payment as a condition for Jani-King providing them with the opportunity to perform cleaning services under cleaning contracts between Jani-King and their customers.

---

[6] In the absence of applicable Connecticut law for their claim under § 31-71e, Plaintiffs rely on Massachusetts law. *See, e.g.*, *Crocker v. Townsend Oil Co.*, 979 N.E.2d 1077 (Mass. 2012); *Awuah v. Coverall N. Am., Inc.*, 952 N.E.2d 890 (Mass. 2011). These cases, while instructive, nevertheless are not binding on this Court, sitting in diversity and bound to apply Connecticut law. *Stephens v. Norwalk Hosp.*, 162 F. Supp. 2d 36, 39 (D. Conn. 2001) ("[A] federal court sitting in diversity applies the substantive law of the forum state . . . ." (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 (1938)).

Plaintiffs, at least some of them, also argue that the down payments due on the Agreement was or has been deducted from their wages. Pls.' Opp. Br. at 7; *see also* Am. Compl. ¶ 23(p) ("Jani-king deducts various sums of money each month from the wages that is pays Plaintiffs . . . including . . . monthly deductions for any portion of the required down payment not already paid to Jani-King"). These payments allegedly violate § 31-73(b) and provide a basis for an unjust enrichment claim. Jani-King argues that § 31-73(b) does not provide for a private right of action and Plaintiffs' § 31-73(b) claim therefore should be dismissed. Defs.' Br. at 14. The Court disagrees.

As the Connecticut Appellate Court has held, "Section 31-73 represents a clear public policy prohibiting an employer from taking advantage of the employment relationship by using the acquisition or continuation of employment as a mechanism for exacting sums of money from an employee." *Lockwood v. Prof'l Wheelchair Transp., Inc.*, 37 Conn. App. 85, 94 (1995). "The statute is written in broad and sweeping language to prohibit such actions by an employer." *Id.* at 94–95. In *Lockwood*, "[t]he discharge of an employee for, as here, refusing to refund a portion of his wages violates public policy as expressed in §31-73." *Id.* at 95. As a result, to the extent that Plaintiffs establish an employer-employee relationship within the meaning of § 31-73(b), then the underlying franchisor-franchisee agreement between the parties may violate this provision, to the extent that any required fees violate public policy. *See Mytych*, 260 Conn. at 166 ("The Appellate Court properly concluded that the language of §31-73(b) was clear and unambiguous in that it prohibits an employer from demanding any . . . sum of money or contribution from any person . . . upon the representation or the understanding that such . . . sum of money . . . is necessary to secure employment or continue in employment.") (internal citation and quotation marks omitted).

Although Defendant rightly argues that § 31-73(b) "does not furnish a private right of action for an employer's refund of wages to secure or continue employment," *Bokanoski v. LePage Bakeries Park St., LLC*, No. 3:15-cv-21 (JCH), *slip op.* at 7 (D. Conn. June 29, 2016), ECF No. 103 (citing *Quiello v. Reward Network Establishment Servs., Inc.*, 420 F. Supp. 2d 23, 33–34 (D. Conn. 2006)), this argument does not foreclose Plaintiffs' unjust enrichment claim, at least at this stage of the case.

Because, as discussed above, *Lockwood* and *Mytych* recognize that a failure to comply with § 31-73(b) violates public policy, Plaintiffs conceivably could prove that the parties' underlying agreement was an employment agreement that conditioned initial or continued employment on payment of a down payment or any number of other fees and is therefore void as a matter of law. As a result, Plaintiffs have plead a plausible claim of unjust enrichment. *See Bokanoski*, No. 3:15-cv-21, at 9 ("[T]he Complaint may fairly be construed to allege that the provisions of the Agreements that purported to require the plaintiffs to 'buy their jobs,' and that allowed the defendants to 'shift business costs' to the plaintiffs violated public policy such that they were unenforceable as having violated Connecticut statutory law, thereby permitting recovery under a theory of unjust enrichment.") (citations omitted).

Indeed, as Chief Judge Hall recognized in *Bokanoski*, "[s]uch facts, as alleged, plead a claim for unjust enrichment, irrespective of whether section 73 of title 31 of the Connecticut General Statutes provides for a private right of action." *Id.* at 10; *see also Horner v. Bagnell*, 324 Conn. 695, 707 (2017) ("[W]herever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract, restitution of the value of what has been given must be allowed . . . .")  As a result, Plaintiffs' unjust enrichment survives for now and Defendants' motion to dismiss is denied.

## IV.     CONCLUSION

For the reasons discussed above, Jani-King's motion to dismiss is **GRANTED** in part

and **DENIED** in part. Plaintiffs' claim for relief under Conn. Gen. Stat. § 31-71e is dismissed.

Plaintiffs' claim for relief under Conn. Gen. Stat. §31-73(b) remains.

**SO ORDERED** at Bridgeport, Connecticut, this 31st day of March, 2018.

_/s/ Victor A. Bolden_____
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE