SIMON MUJO and INDRIT MUHARREMI,
*on behalf of themselves and all others*
*similarly situated*,
     *Plaintiffs*,

        v.

JANI-KING INTERNATIONAL INC., et al.,
     *Defendants*.

No. 3:16-cv-1990 (VAB)

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Simon Mujo and Indrit Muharremi, on behalf of a class of over 100 Jani-King franchisees

(collectively "Plaintiffs"), allege that Jani-King International, Inc., Jani-King, Inc., and Jani-King

of Hartford, Inc. (collectively "Defendants" or "Jani-King") unlawfully classified them as

independent contractors and were unjustly enriched in violation of Conn. Gen. Stat. § 31-73(b).

Jani-King moves for summary judgment.

For the following reasons, Jani-King's motion for summary judgment is **GRANTED.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

Plaintiffs signed Jani-King franchise agreements to "operate a Jani-King franchise

cleaning and maintenance services company" and to provide commercial cleaning services using

Jani-King's trademarks and system. Pls.' Local Rule 56(a)(2) Statement of Material Facts in

Opp. to Jani-King Mot., ECF No. 155 ¶ 1 (Aug. 2, 2019) ("Pls.' SMF"); Ex. 2: Luli & Son LLC[1]

Franchise Agreement, ECF No. 136-5 at § 4.1 (Apr. 23, 2014) ("Luli & Son Franchise Agmt.");

---

[1] Luli & Son LLC is the entity through which Mr. Muharremi entered the Jani-King franchise agreement. The Luli & Son Franchise Agreement and the Mujo Franchise Agreement are substantially similar.

Ex. 1: Simon Mujo Franchise Agreement, ECF No. 136-4 at § 4.1 (July 11, 2007) ("Mujo Franchise Agmt."). Plaintiffs' claims arise out of the Jani-King franchise agreement and the ensuing business relationship between the parties. The parties dispute whether Jani-King's franchise agreements permit the Plaintiffs to operate as independent contractors with their own commercial cleaning businesses, or whether Plaintiffs are employees. Pls.' SMF ¶ 1.

<u>Jani-King's Franchise System and Model</u>

Jani-King sells commercial cleaning service-based franchises, and requires franchisees to operate under its franchise system in a particular geographic area. Pls.' SMF ¶¶ 54, 56. Jani-King provides janitorial services to commercial entities. *Id.* ¶ 89. Jani-King's workers are classified as independent contractor franchisees. *Id.* ¶ 91 (citing Luli & Son Franchise Agmt. at § 12.6).

Jani-King owns all contracts with its cleaning customers and is solely responsible for drafting all cleaning contracts. *Id.* ¶ 93; *see also* Mujo Franchise Agmt. at § 4.7.1 ("All monies received from clients are the property of Franchisor."). Jani-King has the exclusive right to "secure commercial cleaning and maintenance contracts." Pls.' SMF ¶ 99 (citing Luli & Son Franchise Agmt. at § 4.3.1); *see also* Ex. 24: Jani-King Uniform Offering Circular, ECF No. 156-5 at JKCT00001104 (Apr. 30, 2007) ("UOC") ("All proposals for services made by [franchisees] to either current or prospective clients must be reviewed and approved by [Jani-King] staff. Any solicitation for services made by [franchisee] must be approved by [Jani-King]."). Additionally, franchisees are limited to accepting or rejecting Jani-King's offered business. Pls.'s SMF ¶ 100 (citing UOC at JKCT00001110). Along with the customer, Jani-King sets the terms of the cleaning services to be provided by franchisees, so franchisees must accept the contract negotiated between Jani-King and the customer. *Id.* ¶ 101.

Once franchisees pay an initial franchise fee down payment and initial finder's fee down payment, they operate under Jani-King's marketing system and use Jani-King's intellectual property. *Id.* ¶¶ 55, 57. Plaintiffs deny that they acquire rights to operate the franchise and allege that "[a]t all times, Jani-King controls the operation." *Id.* at ¶ 55. Plaintiffs note that among other indices of control, their franchise agreements state that:

> Franchisor has developed and used, and continues to develop, use and control in connection with its System, certain confidential information, programs, devices, methods, techniques and processes which are not generally known to the public pertaining to franchising, promotion, marketing, operation and management of a business, . . . which includes but is not limited to information regarding the operational, sales, promotional methods and techniques, and marketing methods and techniques of Franchisor and the Jani-King program.

*Id.* (citing Mujo Franchise Agmt. at § 4.1.2; Luli & Son Franchise Agmt. at § 4.1.3). Plaintiffs also allege that some franchisees pay the entirety of the initial fee upfront, while others pay it over time, with the fee being deducted from their pay. *Id.* ¶ 96.

According to the franchise agreement, Jani-King has the "exclusive right to perform all billing and accounting functions for the services." Luli & Son Franchise Agmt. at § 4.8. The franchisee must pay 3% of gross revenue as an accounting fee to Jani-King. *Id.* Plaintiffs allege they must agree to these support services even if they would rather forgo them. Pls.' SMF ¶ 58.

According to the franchise agreement, franchisees pay various fees: a 10% royalty fee on monthly gross revenue, subject to certain minimum accounts, *id.* ¶ 59 (citing Luli & Son Franchise Agmt. at § 4.5.1); an advertising fee of 1.5% gross revenue for specified marketing programs intended to "maximize general public recognition and acceptance of the registered trademarks and enhance the collective success of all [Jani-King] franchises," *id.* ¶ 61 (citing Luli & Son Franchise Agmt. at § 4.5.2(1)); and a finder's fee for additional cleaning work—over and

above the initial business purchased—referred by Jani-King, *id.* ¶ 62 (citing Luli & Son Franchise Agmt. at § 4.6). Other fees include insurance fees (otherwise known as the "business protection plan"), complaint fees, miscellaneous fees, and charge-backs. *Id.* ¶ 97; *see also id.* ¶ 98 (explaining that a charge-back occurs when a customer fails to pay Jani-King for work already performed by Plaintiffs; Jani-King deducts this amount from Plaintiff's earnings); Luli & Son Franchise Agmt. at § 4.8.1 ("Any money not collected in an account for any reason will be charged back to Franchisee."). These contractual fees are all deducted monthly from the gross revenue generated by franchisees. *Id.* ¶ 64. Plaintiffs deny that the franchise agreement defined "compensation," but Jani-King alleges that Plaintiffs "expressly agreed that their compensation would exclude all fees set out in their respective agreements." *Id.*

Under the franchise agreement, franchisees are responsible for providing and maintaining worker's compensation and liability insurance. *Id.* ¶ 66.

In order to ensure continuous service and client communication, Jani-King has required franchisees to notify the regional office of vacations and contact information for the people who will be responsible for servicing the accounts. *Id.* ¶ 67. Subject to customer requirements, franchisees set their own schedules. *Id.* ¶ 68. Franchisees could exchange customer accounts with other franchisees, subject to Jani-King approval, and franchisees also could decline or stop servicing customer accounts, but they risk not getting additional work to make up the difference in revenue. *Id.* (citing UOC at JKCT00001057).

Jani-King requires franchisees to "purchase certain professional products and equipment . . . under specifications in the Franchise Agreement and operating manuals." UOC at JKCT00001090; *see generally id.* at JKCT00001090-91 (describing restrictions on sources of products, supplies, and equipment for the cleaning services). Jani-King also determines the

advertising and promotional materials used by franchisees, Pls.' SMF ¶ 106 (citing UOC at JKCT00001098),

Franchisees are responsible for inspecting their customer accounts, Pls.' SMF ¶ 70, and Jani-King also conducts "quality control inspections of accounts . . . from time to time in order to insure [sic] that the service is performed in accordance with the cleaning schedule or instructions associated with the contract between Franchisor [Jani-King] and the customer and to the performance standards of Jani-King," Luli & Son Franchise Agmt. at § 4.19.3.

Jani-King requires franchisees to "meet brand standards addressing everything from cleaning results, to the appearance of people cleaning (e.g., that cleaners should wear clean uniforms with name tags . . . ), to how the service is associated with Jani-King trade names and advertising." Pls.' SMF ¶ 71; *see also id.* ¶ 108 (cleaners must wear Jani-King branded uniforms). Additionally, franchisees are prohibited from bringing extra items or non-employees (including children and animals) to the customer site.

Jani-King requires franchisees to agree not to hold themselves out as an agent, servant, or employee of Jani-King, so that franchisees may not, without prior written approval, obligate Jani-King for any expenses, liabilities, or other obligations. *Id.* ¶ 72 (citing Mujo Franchise Agmt. at § 12.7; Luli & Son Franchise Agmt. at § 12.6).

Franchisees may sell their businesses, subject to Jani-King's right of first refusal and written consent. Pls.' SMF ¶ 74. Franchisees are subject to non-compete and non-solicitation provisions after leaving the Jani-King franchise system for a period of two years (within the originally-contracted territory) or one year (outside the territory); during that period, franchisees may not engage in an "independently established trade, occupation, or business" in the commercial cleaning industry. *Id.* ¶¶ 75, 117 (citing Luli & Son Franchise Agmt. at § 5.2.3).

Jani-King's franchise agreements have ten or twenty year terms, *id.* ¶ 76, and may be terminated upon the occurrence of any of the sixteen conditions of default, *id.* (citing Luli & Son Franchise Agmt. § 8.1). Plaintiffs allege that the "highly subjective conditions in Section 8.1 effectively provide Jani-King with the right to terminate franchisees at will, since it can decide whether Franchisees have engaged in 'conduct which reflects unfavorably upon . . . Jani-King[.]'" *Id.* (citing Luli & Son Franchise Agmt. at § 8.1(g)(iii)). For many of the conditions for default and termination, Jani-King may terminate the franchise agreement upon thirty (30) days notice. *Id.* ¶ 114 (citing Luli & Son Franchise Agmt. at § 8.1(g)(i)-(ix)).

Jani-King provides mandatory initial training, as well as training manuals. *Id.* ¶ 77. Plaintiffs allege the cleaning methods in the training manuals are not simply recommended techniques, because the franchise agreement may be terminated if franchisees "fail[] to maintain the standards that Franchisor requires in this Agreement or any other standards in Jani-King manuals." *Id.* (citing Luli & Son Franchise Agmt. at § 8.1(g)(ii)). Additionally, Jani-King may suspend franchisees or require additional training until they meet Jani-King's minimum standards. *Id.* ¶ 81. Jani-King may also charge more fees to these franchisees who fail to correct deficiencies to the client or Jani-King's satisfaction. *Id.* ¶ 83.

According to the franchise agreement between the parties:

> Franchisee understands and agrees that Franchisee is required to maintain a good relationship with each customer serviced by Franchisee, and that Franchisor may inspect any premises serviced by Franchisee at any time to ensure that the quality of service being rendered is in accordance with Jani-King standards.

*Id.* ¶ 82 (quoting Luli & Son Franchise Agmt. at § 4.19; Mujo Franchise Agmt. at § 4.17).

Although Jani-King alleges it may only terminate franchise agreements "for cause and subject to both contractual notice and any additional requirements imposed by the Connecticut

Franchise Act," Conn. Gen. Stat. § 42-133(f)(a), Defendants' Local Rule 56(a)(1) Statement of Undisputed Facts, ECF No. 136-2 ¶ 84 (June 10, 2019) ("Jani-King SMF"), Plaintiffs allege that the broad and subjective conditions for default in Section 8.1, along with the fact that "Jani-King does not continuously guarantee any level of work or accounts," "effectively provide Jani-King with the right to terminate franchisees at will," Pls.' SMF ¶ 84; *see also id.* ¶ 86 (citing Luli & Son Franchise Agmt. at § 6.1.2 ("Franchisor does not guaranty that the Initial Business will reach or remain at the level stated on the Franchise Summary throughout the term of this Agreement.") (emphasis omitted)). Jani-King does allow franchisees to pursue additional business, provided that they submit all sales proposals for Jani-King's prior approval. *Id.* ¶ 87; *see also* UOC at JKCT00001104. In addition, although franchisees may sell extra services to customers, franchisees must still receive prior approval from Jani-King. *Id.* ¶¶ 88, 102.

Jani-King employs staff to monitor customer satisfaction and field customer inquiries, including complaints. Additionally, Jani-King's centralized computer system stores call logs, which Plaintiffs allege demonstrate Jani-King's "extensive involvement" with Plaintiffs and Jani-King customers. *Id.* ¶ 105.

<u>Mr. Mujo's Relationship with Jani-King</u>

On July 11, 2007, Mr. Mujo entered into a franchise agreement with Jani-King. *See* Mujo Franchise Agmt. Mr. Mujo claims he "was only a worker" for Jani-King and was not a franchise owner. Ex. 31: Deposition of Simon Mujo, ECF No. 156-12 at 26:7-13 (July 27, 2018) ("Mujo Depo."); *see also* Pls. SMF ¶ 2 (admitting that Plaintiff Mujo "performed the manual labor of cleaning the offices per Jani[-]King's specifications" beginning in 2007). Mr. Mujo admits that his Franchise Agreement obligated him to "act at all times as an independent contractor," but he alleges that notwithstanding this language, he was a Jani-King employee. Pls. SMF ¶ 3 (citing

Mujo Franchise Agmt. at § 12.7, but noting generally the numerous controls exercised by Jani-King).

Mr. Mujo paid $44,175 as an initial franchise fee down payment and initial finder's fee down payment in exchange for his use of the Jani-King "System, Property Marks, and Confidential Information." *Id.* ¶ 4 (citing Mujo Franchise Agreement at 1, § 4.3). Mr. Mujo had no prior sales experience. *Id.* ¶ 5. Mr. Mujo understood that "Jani-King was obligated to offer [him] at least $15,000 in monthly revenue during the first 480 days of [his] agreement period," Mujo Depo. at 105:2-9, and that Jani-King would keep a certain percentage of revenue equal to its fees, Pls. SMF ¶ 6. Mr. Mujo received Monthly Franchise Reports, which disclosed both customer revenue and Jani-King fees and deductions. *Id.* ¶ 7. According to Mr. Mujo, "[o]nly Jani-King representatives communicated with the customer accounts such that [he] did not have any contact with customers at all." *Id.* ¶ 8 (citing Mujo Depo. at 143:1-24). Mr. Mujo claims that he did not receive training to clean specialized accounts, like hospitals and restaurants, *id.* ¶ 9 (citing Mujo Depo. 1211:18-123:33), and he asserts the "Jani-King representatives were unknowledgeable and unable to answer questions about what kind of cleaning tools he should use for new customer accounts," *id.* ¶ 10.

According to Jani-King policies and his franchise agreement, Mr. Mujo's cleaning work had to be performed "in accordance with the cleaning schedule or instructions associated with the contract between [Jani-King] and the client to [Jani-King's] performance standards." *Id.* ¶ 11 (citing Mujo Franchise Agmt. § 4.17). Mr. Mujo claims that he only declined customer accounts offered by Jani-King when Jani-King instructed him to do so. *Id.* ¶¶ 12-13 (citing Mujo Depo. at 109:4-110:9). Mr. Mujo could and did hire employees, but he only hired one part-time employee, his cousin, and Mr. Mujo disputes that he supervised his cousin because his cousin also had to

"follow current established Jani-King polices, practices, and procedures." *Id.* ¶ 14 (citing Mujo Franchise Agmt. At § 4.2.2).

Mr. Mujo provided his own equipment and transportation for cleaning jobs, and he sometimes purchased supplies at Wal-Mart or Lowe's, which lowered his costs. *Id.* ¶ 15 (noting that Mr. Mujo also purchased supplies where Jani-King told him to go). Although Mr. Mujo allegedly did not know his franchise agreement allowed him to solicit potential clients, *id.* ¶ 18, he notes that "[a]ll contracts under which terms services are provided by any Jani-King franchisee are the sole property of Jani-King," Mujo Franchise Agmt. § 4.19.2. Mr. Mujo admits he "did not believe he could improve the speed or efficiency of cleaning work, . . . that a customer account would take just as long to clean the first time as it would the twenty-fifth time." Pls.'s SMF ¶ 19.

Mr. Mujo "never communicated" with customers directly, but admits that customers made complaints to Jani-King. *Id.* ¶ 21 (citing Mujo Depo. at 143:16-24). One customer complained to Jani-King that Mr. Mujo had inappropriately touched an employee, and requested that a new franchisee clean their office. Ex. 6 March 15, 2011 Incident Report, ECF No. 136-8 at 2 (July 19, 2017). Mr. Mujo denies the incident occurred, but admits the complaint was made. Pls. SMF ¶ 22. Another customer, a physician's group, cancelled their Jani-King contract after complaining that Mr. Mujo's franchise did not adequately clean their premises, even after the group spoke to Mr. Mujo. *Id.* ¶ 23. Mr. Mujo has no memory of speaking to anyone at the physician's group about the alleged problem, but admits the complaint was made. *Id.*

Mr. Mujo provided cleaning services for Jani-King until early 2016. *Id.* ¶ 120. Throughout the term of his franchise agreement, Mr. Mujo paid finder's fees for new accounts, and paid the many other fees as well. *Id.* ¶ 121.

<u>Mr. Muharremi's Relationship with Jani-King</u>

On April 23, 2014, on behalf of his limited liability company, Luli & Son, LLC, Mr. Muharremi entered into a franchise agreement with Jani-King. Luli & Son Franchise Agmt. Mr. Muharremi admits that his Franchise Agreement stated that "Franchisee will be at all times an independent contractor," but alleges that notwithstanding this language, Mr. Muharremi was a Jani-King employee and was not permitted to operate as an independent contractor. Pls. SMF ¶ 25 (citing Luli & Son Franchise Agmt. at § 12.6, and noting the many indices of control throughout the Franchise Agreement).

Mr. Muharremi paid $16,250 as an initial franchise fee down payment and initial finder's fee down payment in exchange for his use of the Jani-King "System, Property Marks, and Confidential Information." *Id.* ¶ 26 (citing Luli & Son Franchise Agreement at 1, § 4.3-4.3.1). Mr. Muharremi understood that he (through Luli & Son LLC) was contracting to receive offers of initial business that would generate $4,000 of gross revenue per month, less specified fees, and acknowledges that "part of what [he] purchased with [his] franchise was access to the Jani-King system, for example, training programs that trained [him] in how to clean accounts according to Jani-King standards." *Id.* ¶¶ 27-28. Although Mr. Muharremi performed his daily duties without supervision, Jani-King personnel sometimes inspected his work for quality control. *Id.* ¶ 29 (citing Luli & Son Franchise Agmt. at § 4.19.3 and various depositions of Jani-King personnel). Mr. Muharremi "held himself out as an owner of a Jani-King franchise through the use of his business card." *Id.* ¶ 30; *see also* Ex. 19: Luli & Son LLC Business Card, ECF No. 136-22 (June 10, 2019) (noting that it was an authorized franchisee of Jani-King, and including Jani-King's logo).

Consistent with Jani-King's constraints and customer schedules, Mr. Muharremi decided when to perform his cleaning services and provided his own equipment. *Id.* ¶ 31. Mr. Muharremi decided "both whether to accept any customer account referred by Jani-King, . . . and whether to use his own or employee labor to provide cleaning services." *Id.* ¶ 32. In the span of four years, Mr. Muharremi is aware of three or fewer quality-control inspections by Jani-King, and none occurred while cleaning services were being performed. *Id.* ¶ 33. Months would pass where Mr. Muharremi had no contact with Jani-King. *Id.* ¶ 34.

Mr. Muharremi recognized that he could "minimize expenses by providing services to nearby customers." *Id.* ¶ 35. Before accepting a new account, Mr. Muharremi collected information about the square footage, fixtures, and any time constraints. *Id.* ¶ 36. He sometimes sold additional services, like stripping floors and carpet extractions, to existing customers. *Id.* ¶ 37. He "individually assessed whether each customer space required an initial deep cleaning, . . . and always inspected work performed by family members before leaving a job." *Id.* ¶ 38.

Mr. Muharremi never tried to "grow" his business or hire employees; never considered what factors made accounts profitable; and never devised strategies to improve efficiency, such as tracking hours spent on different accounts. *Id.* ¶ 39. Mr. Muharremi personally serviced the accounts "90 percent of the time." *Id.* (citing Ex. 7: Deposition of Indrit Muharremi, ECF No. 136-10 at 230:6-10 (Apr. 18, 2018) ("Muharremi Depo.")). Mr. Muharremi shopped for the lowest price on cleaning supplies and equipment, but noted that "there [are] better deals but not [for] Jani-King approved supplies." *Id.* (citing Muharremi Depo. at 143:11-144:5).

Mr. Muharremi continues to perform cleaning services for Jani-King under his franchise agreement. *Id.* ¶ 118. As a result, he alleges he pays finder's fees "as a condition of securing

more cleaning work with Jani-King" for new accounts, and continues to pay the many fees and charge-backs deducted from his account. *Id.* ¶ 119.

Other Jani-King Franchisees

Jani-King submits evidence of profitable businesses run by other franchisees, which Plaintiffs do not dispute. *See* Pls.' SMF ¶¶ 40-53. Plaintiffs do emphasize that "customer contracts are between the customer and Jani-King," that "Jani-King must approve all bids to provide cleaning services," and "that Jani-King does have involvement in determining the schedule and frequency for cleaning accounts." Pls.' SMF ¶ 53.

These other franchisees ensure the profitability of their businesses by: providing cleaning services through teams of employees hired, paid, and scheduled without any involvement from Jani-King, *id.* ¶ 41; buying cleaning supplies from different sources to minimize costs, *id.* ¶ 42; evaluating profitability before accepting new customer accounts by, *inter alia*, ensuring that new customers' location, scheduling requirements, difficulty, and pricing will turn a profit, *id.* ¶¶ 43, 45; communicating with customers directly about their needs, *id.* ¶ 46; and providing extra services, *id.*

Jose Mendez, a Jani-King franchisee, has managed his business remotely for a year by providing cleaning services entirely through the labor of his employees. *Id.* ¶ 48.

Michael Champigny, another franchisee, has generated as much as $14,000 in gross revenue a month, while working with eight part-time employees. *Id.* ¶ 50.

B.    **Procedural History**

On December 5, 2016, Plaintiffs filed this lawsuit, and on March 9, 2017, they filed an Amended Complaint alleging that: (1) Jani-King violated the Minimum Wage Act; and (2) Jani-

King has been unjustly enriched. Compl., ECF No. 1 (Dec. 5, 2016); Am. Compl., ECF No. 41 (Mar. 9, 2017).

On March 30, 2017, Jani-King moved to dismiss both the wage and unjust enrichment claims in the Amended Complaint under Rule 12(b)(6) for failure to state a claim. Mot. to Dismiss, ECF No. 45 (Mar. 30, 2017).

On March 31, 2018, the Court granted in part and denied in part Jani-King's motion to dismiss. *Mujo v. Jani-King Int'l, Inc.* (*Mujo I*), 307 F. Supp. 3d 38 (2018); *see also* Order and Ruling on Defs.' Mot. to Dismiss, ECF No. 82 (Mar. 31, 2018).

The Court dismissed the state-law wage claim, but preserved the unjust enrichment claim because "Plaintiffs conceivably could prove that the parties' underlying agreement was an employment agreement that conditioned initial or continued employment on payment of a down payment or any number of other fees and is therefore void as a matter of law." *Mujo I*, 307 F. Supp. 3d at 51.

On April 23, 2018, Plaintiffs moved to certify the class. Mot. to Certify Class, ECF No. 87 (Apr. 23, 2018).

On January 9, 2019, the Court granted Plaintiffs' motion and certified the class. Ruling and Order on Class Certification, ECF No. 130 (Jan. 9, 2019).

On June 10, 2019, Jani-King timely moved for summary judgment, and filed a supporting memorandum, a statement of material facts, and twenty other exhibits. Mot. for Summ. J., ECF No. 136 (June 10, 2019) ("Jani-King Mot."); Defs.' Mem. in Supp. of Mot. for Summ. J., ECF No. 136-1 (June 10, 2019) ("Jani-King Mem."); Defs.' Local Rule 56(a)(1) Statement of Undisputed Facts, ECF No. 136-2 (June 10, 2019) ("Jani-King SMF").

On July 15, 2019, Plaintiffs filed a cross-motion for summary judgment. Cross-Mot. for Summ. J. and Opp. to Jani-King Mot., ECF No. 143 (July 15, 2019).

On July 24, 2019, the Court *sua sponte* struck Plaintiffs' cross-motion for being untimely and without authorization from the Court. Order, ECF No. 149 (July 24, 2019). Accordingly, the Court ordered Plaintiffs to file a response by August 2, 2019, to Jani-King's motion for summary judgment, which was properly pending before the Court. *Id.*

On August 2, 2019, Plaintiffs timely opposed Jani-King's motion for summary judgment. Pls. Opp. to Jani-King Mot., ECF No. 154 (Aug. 2, 2019) ("Pls.' Opp."). Plaintiffs also filed their response to Jani-King's statement of material facts, a supporting memorandum, and fourteen exhibits. *See* Docket Entries, ECF Nos. 155-56 (Aug. 2, 2019).

On August 16, 2019, Jani-King timely replied. Defs. Reply in Support of Jani-King Mot., ECF No. 161 (Aug. 16, 2019) ("Jani-King Reply").

On November 19, 2019, the Court held a hearing on Jani-King's motion for summary judgment. Minute Entry, ECF No. 172 (Nov. 19, 2019).

## II.   STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law.") (citing *Anderson*, 477 U.S. at 248).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed.

R. Civ. P. 56(c); *Pelletier*, 2007 WL 685181, at *7. In reviewing the record, a court must

"construe the evidence in the light most favorable to the non-moving party and to draw all

reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*,

716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from

which a reasonable factual inference could be drawn in favor of the non-moving party for the

issue on which summary judgment is sought, then summary judgment is improper. *See Security*

*Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.    DISCUSSION

Plaintiffs' class-wide unjust enrichment claims are based on Jani-King's purported

violation of Connecticut's anti-kickback statute, Conn. Gen. Stat. § 31-73(b), which provides:

> No employer, contractor, subcontractor, foreman, superintendent or supervisor of labor, acting by himself or by his agent, shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person, or deduct any part of the wages agreed to be paid, upon the representation or the understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary to secure employment or continue in employment. No such person shall require, request or demand that any person agree to make payment of any refund of wages, fee, contribution or deduction from wages in order to obtain employment or continue in employment. A payment to any person of a smaller amount of wages than the wage set forth in any written wage agreement or the repayment of any part of any wages received, if such repayment is not made in the payment of a debt evidenced by an instrument in writing, shall be prima facie evidence of a violation of this section.

Section 31-73(b).

Jani-King argues that Plaintiffs' unjust enrichment claims fail, as a matter of law, because

(1) Plaintiffs are not employees; and (2) the payment of franchise fees, which Jani-King alleges

are the sole payments made by Plaintiffs to Jani-King, does not violate any public or legislative

policy. Jani-King Mem. at 1-2.

The Court will address each of these arguments in turn.

Ultimately, while there is a genuine issue of material fact as to whether Plaintiffs are employees rather than independent contractors under Connecticut law, this record lacks the evidence necessary to create a genuine issue of fact as to their entitlement to relief on their unjust enrichment claim.

## A.   Applicability of the Employee Status Test to Franchise Agreements

Jani-King argues that Plaintiffs' status as franchisees under the Connecticut Franchise Act, Conn. Gen. Stat. §§ 42-133e – 42-133h ("CFA"), cannot create employment under Connecticut's wage statutes. Jani-King Mem. at 15. In other words, as they argued similarly in their motion to dismiss, Jani-King contends that being a franchisee is mutually exclusive with being an employee, and reading the wage and franchise statutes "to regulate broadly overlapping economic arrangements would both contradict the legislature's purpose and bring the CFA and Connecticut wage statutes . . . into avoidable conflict." *Id.*

In Jani-King's view, these two sets of statutes impart different remedial schemes that— according to Jani-King—are "incompatible" and "irreconcilable." *Id.* at 18 ("Layering employee onto franchise protections for small or owner-operated franchises could upend the regulatory scheme and legislative judgment enacted by the CFA."). Instead, Jani-King argues that the Court should exclude contractual standardization of quality, which is inherent in franchise agreements, from its analysis of employer control in the ABC[2] test.  *Id.* at 18-19.

To Plaintiffs, Connecticut's ABC test for independent contractor misclassification "creates a presumption that 'any service provided by an individual is considered employment,

---

[2] Connecticut General Statutes § 31-222(a)(1)(B)(ii) is "commonly referred to as the 'ABC test,' with parts A, B and C corresponding to clauses I, II and III respectively." *Sw. Appraisal Grp. LLC v. Adm'r Unemployment Compensation Act*, 324 Conn. 822, 832 (2017) (internal citations omitted).

unless and until the recipient of the services' can prove all three prongs of the test." Pls.' Opp. at 1-2 (citing *Tianti ex rel Gluck v. Williams Raveis Real Estate, Inc.*, 231 Conn. 690, 697-98 n.8 (1995)). Plaintiffs argue that they provide commercial cleaning work, which is part of Jani-King's regular business, and that the record demonstrates Jani-King's right to control Plaintiffs' work, both under the contract and in fact, *id.* at 21-22 (explaining why Plaintiffs satisfy part A of the ABC test); that the customer premises where Plaintiffs provide their cleaning services are part of Jani-King's usual places of business, *id.* at 12-18 (explaining why Plaintiffs satisfy part B of the ABC test); and that they are not engaged in a distinct business from Jani-King, *id.* at 18-20 (explaining why Plaintiffs satisfy part C of the ABC test). As a result, Plaintiffs argue that "[a]llowing Jani-King to hide behind the franchise label to avoid the consequences of its misclassification of the plaintiffs would seriously weaken and undermine an important, remedial statute, and . . . does a disservice to . . . franchise systems that do not control every aspect of their franchisees' work." *Id.* at 25.

In reply, Jani-King argues that quality standards are fundamental in a franchise agreement, and these quality standards are different from employer supervision. Jani-King Reply at 7-10. According to Jani-King, "[f]ranchisees with the right to decline to provide services and to provide service with no supervision whatsoever are not employees." *Id.* at 11 (emphasis omitted).

The Court disagrees.

As this Court has already held, *see Mujo I*, 307 F. Supp. 3d at 45, under Connecticut law, the provision of services by an individual is presumptively employment. *See Standard Oil of Conn., Inc. v. Adm'r, Unemployment Comp. Act*, 320 Conn. 611, 616 (Conn. 2016) ("Because the provision is in the conjunctive, the party claiming the exception to the rule that the service is

employment must show that all three prongs of the test have been satisfied." (citation omitted)).

The Minimum Wage Act provides:

> Service performed by an individual shall be deemed to be employment . . . unless and until it is shown . . . that (I) such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; and (II) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and (III) such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed . . . .

Conn. Gen. Stat. § 31-222(a)(1)(B)(ii) (setting forth Connecticut's ABC test). The statute includes a lengthy list of services excluded from "employment" within the meaning of the Minimum Wage Act. *See, e.g.*, Conn. Gen. Stat. § 31-222(a)(5)(A) (providing, *inter alia*, that "service[s] performed by an individual in the employ of such individual's son, daughter or spouse, and services provided by a child under the age of eighteen in the employ of such child's father or mother" are exempted subject to record keeping requirements).

This Court has also previously found that nothing in the text, purpose, or caselaw of either the Connecticut Minimum Wage Act or the Connecticut Franchise Act precludes the application of the relevant independent contractor test under § 31-222 to the franchisor-franchisee relationship. *See Mujo I*, 307 F. Supp. 3d at 46 ("Jani-King has not cited nor has the Court identified any Connecticut decisions precluding application of the independent contractor test to a franchise agreement."). Significantly, "[§ 31-222] makes no express exemption for franchises, nor can we imply an exemption, particularly when, as is the case here, the legislature has created numerous exemptions from coverage under the act." *Jason Roberts, Inc. v. Adm'r*, 127 Conn. App. 780, 787 (2011); *see also Standard Oil*, 320 Conn. at 616 ("When interpreting

provisions of the act, we take as our starting point the fact that the act is remedial and, consequently, should be liberally construed in favor of its beneficiaries. . . . Indeed, the legislature underscored its intent by expressly mandating that the act shall be construed, interpreted and administered in such manner as to presume coverage, eligibility and nondisqualification in doubtful cases." (internal quotation marks and citations omitted)).

Accordingly, Connecticut's ABC test is the appropriate one for determining if there is a genuine issue of material fact as to whether Plaintiffs were unlawfully misclassified as independent contractors.

### 1.      Part A of Connecticut's ABC Test

Part A of Connecticut's ABC test focuses on the purported employer's "right to control the means and methods of work." *Standard Oil*, 320 Conn. at 623 (internal citations omitted). The question is "who has the right to direct what shall be done and when and how it shall be done?" *Id.* "The determination of general control is not always a simple problem. Many factors are ordinarily present for consideration, no one of which is, by itself, necessarily conclusive." *Tianti*, 231 Conn. at 698 (citing *Silverberg v. Great Sw. Fire Ins. Co.*, 214 Conn. 632, 639 (1990); *Bourgeois v. Cacciapuoti*, 138 Conn. 317, 321 (1951)). An independent contractor "contracts to do a piece of work according to his own methods and without being subject to the control of his employer, except as to the result of his work." *Tianti*, 231 Conn. at 697. The purported employer "bears the burden of showing that the workers hired as independent contractors have been and will continue to be free from control and direction in connection with the performance of services, both under their contract for the performance of services and in fact." *Standard Oil*, 320 Conn. at 624 (internal quotation marks and formatting omitted).

Connecticut courts have emphasized the right to discharge or terminate an individual and the right of intervention as indicative of a general right to control. *See Latimer v. Adm'r, Unemployment Compensation Act*, 216 Conn. 237, 251 (1990) (The "right of intervention . . . evinces a right to control and direct[.]"); *Standard Oil*, 320 Conn. at 630 ("The right to terminate [an employment] relationship without liability is not consistent with the concept of an independent contract[or]." (citing *Tianti*, 231 Conn. at 698)).

Here, Jani-King emphasizes the franchise agreement between the parties. Jani-King Mem. at 22. Jani-King submits that the express terms of the contract allow Plaintiffs to decide how to perform cleaning services, when the services would be performed, by whom, and whether Plaintiffs would provide services at all. *Id.* Furthermore, Jani-King argues that Plaintiffs were free to chose customer accounts; free to set their schedules; free to hire employees; provided with opportunities for profit and loss; paid by the customer account instead of an hourly rate; not subject to termination without cause; and, most importantly, expressly classified as independent contractors. *Id.* at 23-25.

In response, Plaintiffs argue that "Jani-King exercises extensive control over nearly every aspect of the Plaintiffs' cleaning work, including, but not limited to: providing customer service, accounting, collections and billing functions in connection with Plaintiffs' cleaning services;" negotiating contracts with customer accounts that are then offered to Plaintiffs to accept or reject; requiring prior approval for any customer accounts solicited by Plaintiffs; controlling all advertising and promotional materials related to Plaintiffs' services; requiring Plaintiffs to wear Jani-King branded uniforms and use other Jani-King branded items; requiring Plaintiffs to meet Jani-King standards in training and on the job; inspecting Plaintiffs' work for "quality-control"; and dictating who and what Plaintiffs may bring to a customer's premises. Pls.' Opp. at 21-22.

Significantly, Plaintiffs emphasize that it is Jani-King, not the Plaintiffs, who enters into contracts with customers seeking commercial cleaning services. *Id.* at 25.

In reply, Jani-King argues that the contractual quality standards inherent in its franchise agreements along with Jani-King's right to enforce its quality standards do not rise to the level of employer supervision required for part A, nor do they give Jani-King a general right of control. Jani-King Reply at 8-10.

The Court disagrees.

The mere existence of a franchise agreement is not dispositive as to whether individuals are independent contractors or employees. *See, e.g.*, *Jason Roberts*, 127 Conn. App. at 787 ("The plaintiff neither cites, nor does our research reveal, any legal support for this argument" that the existence of a franchise agreement exempts the relationship from purview of § 31-222(a)(1)(B).). "The determination of the status of an individual as an independent contractor or employee . . . is a question of fact." *Tianti*, 231 Conn. at 696 (citation omitted).

Here, significantly, Jani-King has formalized its right to intervene and its right to terminate the franchise agreement with Plaintiffs. First, Jani-King retains the right to conduct "quality control inspections of accounts" to ensure that Plaintiffs' service (1) adheres to "the contract between Franchisor [Jani-King] and the customer" and (2) meets Jani-King's "performance standards." Luli & Son Franchise Agmt. at § 4.19.3. Although Jani-King submits that it only conducts these inspections "from time to time," Connecticut courts have repeatedly held, "[i]t is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant and agent." *Id.* at 697 (citing *Latimer v. Adm'r, Unemployment Compensation Act*, 216 Conn. 237, 248 (1990); *see also Caraher v. Sears, Roebuck & Co.*, 124 Conn. 409, 413-14 (1938)). As a result, it is not the

frequency with which Jani-King exercises its right to intervene in the form of quality control inspections, but the fact that Jani-King retains this right at all means a reasonable factfinder could conclude that Jani-King has general control over the Plaintiffs and their work.

Second, Jani-King may terminate the franchise agreement upon the occurrence of sixteen conditions of default, which include circumstances wherein Plaintiffs "fail[] to maintain [Jani-King] standards" as reflected in the franchise agreement or any of Jani-King manuals. Luli & Son Franchise Agmt. § 8.1(g)(ii). These conditions of default are extensive, and many allow Jani-King to terminate the franchise relationship within thirty (30) days after written notice. *See id.* § 8.1(g). Furthermore, many of these conditions of default are highly subjective, as the Plaintiffs allege, and "effectively provide Jani-King with the right to terminate franchisees at will, since it can decide whether Franchisees have engaged in 'conduct which reflects unfavorably upon . . . Jani-King[.]'" Pls.' SMF ¶ 76 (citing Luli & Son Franchise Agmt. at § 8.1(g)(iii) (delineating as a condition of default when franchisee "engages in conduct which reflects unfavorably upon the operation or reputation of the Jani-King franchise business or System")). As a result, a reasonable factfinder could find that Jani-King's "right to terminate [the] relationship without liability is not consistent with the concept of an independent contract[or]." *See Standard Oil*, 320 Conn. at 630 (internal citation omitted).

In addition to these two major indicators of general control, Jani-King's level of control and involvement in nearly every aspect of Plaintiffs' provision of cleaning services extends beyond merely ensuring quality standards. The record shows that Jani-King controls the manner and means of its franchisees' work through its training, inspections, and detailed policies and procedures that franchisees must follow. *See* Jani-King SMF ¶ 77 ("Jani-King provides mandatory initial training . . . manuals with information about recommended techniques for

operating, marketing, and managing a franchise business, as well as general specifications for the equipment needed to perform the work."); *id.* ¶ 81 ("Jani-King may address *repeated* deficiencies by suspending the franchise owner's contractual right to serve customer accounts . . . or by providing additional training[.]" (emphasis in original)); *id.* ¶ 82 ("The franchise agreement provides that: 'Franchisee understands and agrees that . . . Franchisor may inspect any premises serviced by Franchisee at any time to ensure that the quality of service being rendered is in accordance with Jani-King standards.'" (quoting Luli & Son Franchise Agmt. at § 4.19; Mujo Franchise Agmt. at § 4.17)). If Plaintiffs fail to meet Jani-King standards in any way, Jani-King may terminate their franchise agreement with limited notice. *See* Luli & Son Franchise Agmt. at § 8.1 (listing sixteen conditions of default wherein Jani-King may terminate the franchise agreement); *see also id.* ("Franchisee shall be deemed to be in default, and Franchisor may, at its option, terminate this Agreement . . . (g) . . .(ii) If Franchisee fails to maintain the standards that Franchisor requires in this Agreement or any other standards contained in Jani-King manuals.").

In *Standard Oil*, the Connecticut Supreme Court held that the individual installers/technicians were not employees, and emphasized the following facts: they all had an independent business that provided the same type of service as they provided for the plaintiff's purported employer; they had their own business cards; advertised their own business; derived income from other sources; and could accept or reject the plaintiff's assignments without any adverse consequences. 320 Conn. at 633.

As already detailed, that is not the case here: all of Plaintiffs' income derives directly from customers contracted for or first approved by Jani-King, *see* UOC, ECF No. 156-5 at JKCT00001104 ("All proposals for services made by [Franchisees] to either current or

prospective clients must be reviewed and approved by [Jani-King] staff. Any solicitation for services made by [Franchisee] must be approved by [Jani-King]."); Plaintiffs' advertising and marketing must follow Jani-King policy, *see* Jani-King SMF ¶ 71 ("Franchise owners agree to meet brand standards addressing everything from cleaning results, to the appearance of people cleaning . . . , to how the service is associated with Jani-King trade names and advertising."); and although Plaintiffs may reject customer accounts, there is no guarantee that they will get additional customers or that their proposals or bids will be accepted by Jani-King, *see* Luli & Son Franchise Agmt. at § 6.1.2 ("Franchisor does not guaranty that the Initial Business will reach or remain at the level stated on the Franchise Summary throughout the term of this Agreement.") (emphasis omitted)). The court in *Standard Oil* also noted that the individuals were not required to wear branded shirts and hats, but were compensated based on the project instead of hourly. 320 Conn. at 635. Although Plaintiffs are also compensated by account, and not hourly, Plaintiffs in contrast are required to wear Jani-King branded uniforms when performing cleaning services. Pls.' SMF ¶¶ 71, 108. Furthermore, unlike the installers/technicians in *Standard Oil*, 320 Conn. at 639, Plaintiffs were trained by Jani-King, and Plaintiffs must operate according to Jani-King manuals and policies.

Thus, Plaintiffs have submitted evidence of Jani-King's control over nearly every aspect of Plaintiffs' cleaning work. A reasonable factfinder thus could find that Jani-King possesses the right of control over the means and methods of Plaintiffs' work.

In order to successfully move for summary judgment, Jani-King must show that all three prongs of the ABC test are met. *See Standard Oil*, 320 Conn. at 616 ("Because [§ 31-222(a)(1)(B)(ii)] is in the conjunctive, the party claiming the exception to the rule that the service is employment must show that all three prongs of the test have been satisfied."). Because the

Court has determined that Jani-King cannot satisfy part A of Connecticut's ABC test, the Court must deny summary judgment.

Nevertheless, the Court will analyze the remaining two prongs of the ABC test.

### 2. Part B of Connecticut's ABC Test

Part B of Connecticut's ABC test focuses on whether the services performed are either outside the purported employer's "usual course of business" or the purported employer's "places of business." § 31-222(a)(1)(B)(ii). A purported employer may thus satisfy part B by establishing either of these two requirements. The Connecticut Supreme Court noted the lack of clarity and consensus in defining "places of business," and after reviewing the case law and the broader statutory scheme, decided that two principles should govern a court's construction of Part B of the ABC test. *Standard Oil*, 320 Conn. at 645-52.

First, the court emphasized "the harmonious construction of related statutes," and noted that the statutory scheme in Connecticut has always provided "that an independent contractor may be considered an employee under the act if the contractor worked 'on or about the premises under such employer's control." *Id.* at 652-53. Thus, "a reviewing court should consider the extent to which the employer exercised control over the location where the independent contractor worked when construing part B of the ABC test." *Id.* at 653.

Second, the court emphasized the "conjunctive nature of the test, which suggests that no one part of the test should be construed so broadly . . . that the other two parts of the test are rendered superfluous." *Id.* at 654. As a result, the court rejected the broad interpretation adopted by some states that "the meaning of 'places of business' . . . should extend to all locations where [individuals] perform[] their services . . . or regularly represented the interests of the [purported employer]." *Id.*

Jani-King contends that customer premises are distinguishable from Jani-King's place of business. Jani-King. Mem. at 27. Plaintiffs submit that an employer's place of business is not limited to its own corporate offices, and should include the premises of commercial cleaning customers. Pls.' Opp. at 15-16. In support, Plaintiffs cite to nonbinding precedent for the proposition that a purported "employer's 'place of business is not limited only to its own offices,' but can extend to any location where workers regularly represent an employer's interest." *Id.* at 15 (collecting cases). Plaintiffs also seek to prevail under the first option for part B by arguing that commercial cleaning work is part of Jani-King's usual course of business, *id.* at 12-15, but Jani-King notes that it relies on the second option, Jani-King Reply at 11. Consequently, Jani-King argues that because it does not control the premises of individual customers, no reasonable factfinder could conclude that Plaintiffs performed cleaning services at Jani-King's usual place of business. *Id.* at 11-12.

The Court disagrees.

Jani-King, as the purported employer, may satisfy part B of the ABC test by establishing either the first or second option, *see* § 31-222(a)(1)(B)(ii) (allowing an enterprise to satisfy part B by establishing either requirement), and Jani-King has chosen the second option, which ascertains whether the services performed are outside the purported employer's "places of business."

Connecticut courts avoid a broad interpretation of "places of business" "because of certain undesirable, practical consequences that might follow," including tax liabilities.[3] *Standard Oil*, 320 Conn. at 654-56. In *Standard Oil*, the Connecticut Supreme Court concluded that the "meaning of 'places of business' . . . should not be extended to the [customer] homes in

---

[3] When a federal court sits in diversity, as this Court does here, it "must predict how that state's highest court would resolve a question of state law." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 402 (2d Cir. 2000).

which the installers/technicians worked, unaccompanied by the [purported employer or his employees] and without the [purported employer's] supervision." *Id.* at 655. The court noted that the homeowner customers' homes were under the homeowners' control, in contrast to the purported employer's business offices, warehouse and other facilities. *Id.* Integral to the court's conclusion were the following: it was the homeowner customers who "(1) determined when access to their homes was convenient; (2) brought the installers/technicians to locations inside their homes and elsewhere on their property where equipment was to be installed; and (3) identified problems with the installation process or with the newly installed equipment during the warranty period." *Id.*

Here, Plaintiffs performed their cleaning services at the workplaces of cleaning customers, and it is the cleaning customers who determine when Plaintiffs could clean and communicated any complaints with Plaintiffs' performance (usually to Jani-King). The cleaning customers also determined whether to admit Plaintiffs to their premises. But unlike in *Standard Oil*, 320 Conn. at 654-56, Plaintiffs here worked in commercial spaces, not residential homes. Additionally, although Jani-King did not accompany the Plaintiffs or directly supervise their regular cleaning, Jani-King could and did perform quality control inspections and required Plaintiffs to adhere to Jani-King standards and policies while cleaning. Furthermore, Jani-King directly tracked and addressed customer complaints, and was present at the site during the initial walk-through and bid process for the cleaning customer contract.

Although "individual job sites are not necessarily synonymous with 'places of business of the enterprise for which the service is performed,'" *Standard Oil*, 320 Conn. at 656, based on this record, a reasonable factfinder could conclude that the premises of commercial cleaning customers were within Jani-King's "places of business."

Accordingly, there is a genuine dispute of material fact as to whether Jani-King satisfies part B of the ABC test.

### 3. Part C of Connecticut's ABC Test

Part C of Connecticut's ABC test focuses on whether the "putative employee 'is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." *Sw. Appraisal Grp. LLC v. Adm'r Unemployment Compensation Act*, 324 Conn. 822, 834 (2017) (citing § 31-222(a)(1)(B)(ii)(III)). "Put differently, part C 'seeks to discern whether the worker is wearing the hat of an employee of the employing company, or is wearing the hat of his own independent enterprise.'" *Id.* at 835 (internal quotations omitted) (citing *Athol Daily News v. Bd. of Review of the Div. of Emp't & Training*, 439 Mass. 171, 181 (2003)).

Importantly, "part C must be considered in relation to the totality of the circumstances, with that inquiry guided by a multifactor test" that "evaluates the dynamics of the relationship between the putative employee and the employer; there is no dispositive single factor or set of factors." *Sw. Appraisal Grp.*, 324 Conn. at 838-39 (citations omitted). "[T]he degree to which a putative employee provides similar services for [other] third parties cannot be considered in isolation from, or given primacy over, the other factors." *Id.* at 840.

A court analyzing part C should consider the following nonexhaustive list of factors:

> (1) the existence of state licensure or specialized skills;
> (2) whether the putative employee holds himself or herself out as an independent business through the existence of business cards, printed invoices, or advertising;
> (3) the existence of a place of business separate from that of the putative employer;
> (4) the putative employee's capital investment in the independent business, such as vehicles and equipment;
> (5) whether the putative employee manages risk by handling his or her own liability insurance;

> (6) whether services are performed under the individual's own name as opposed to the putative employer;
> (7) whether the putative employee employs or subcontracts others;
> (8) whether the putative employee has a saleable business or going concern with the existence of an established clientele;
> (9) whether the individual performs services for more than one entity; and
> (10) whether the performance of services affects the goodwill of the putative employee rather than the employer.

*Id.* at 839-40; *see also id. at* 833-34 ("In applying the ABC test, we must balance preventing the use of sham independent contractor agreements to avoid unemployment insurance obligations against hampering those who undertake to do business together as independent contracting parties, rather than as employer and employee, on a legitimate basis." (internal quotation marks and citations omitted)).

Jani-King submits that by operating a franchise, Plaintiffs are customarily engaged in an independently established business, and not working as employees. Jani-King Mem. at 28. Consistent with their franchise agreements, Jani-King submits that Plaintiffs made capital investments in the form of franchise fees; provided their own equipment and transportation; hired or knew they could hire employees; provided cleaning services to multiple customers; generated customer goodwill or suffered consequences of poor service; owned potentially saleable businesses; and held themselves out as owners of Jani-King franchisees through their business cards. *Id.* at 29-30. According to Jani-King, "[t]reating the hallmarks of franchising as proof of employment would transform franchisees into employees, upending the legislative policy enacted by the CFA." *Id.* at 29. Jani-King emphasizes that Plaintiffs' entrepreneurial choices, and specifically lack of interest in expanding or increasing efficiency, had economic consequences that do not indicate employment.[4] *Id.* at 29.

---

[4] Jani-King provides examples of other franchisees with more successful franchises than Plaintiffs. These franchisees' experiences are summarized above, *supra* at 1-12.

In response, Plaintiffs contend that they are not actively supplying cleaning services to third parties. Pls.' Opp. at 18. They submit that they are not engaged in a distinct business of commercial cleaning: not only are the cleaning customers supplied or approved by Jani-King, but Plaintiffs are subject to a non-compete provision for at least one year after termination of the Jani-King franchise agreement. *Id.* at 19-20. Plaintiffs ask this Court to consider, like courts in Massachusetts have done, whether "'the worker is capable of performing the service to anyone wishing to avail themselves of the services, or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services.'" *Id.* at 19 (citing *Coverall North America, Inc. v. Com'r of Div. of Unemployment Assistance*, 447 Mass. 852, 858 (2006) (quoting *Athol Daily News v. Bd. of Review of Div. of Emp't and Training*, 439 Mass. 174, 181 (2003))). According to Plaintiffs, "when they are cleaning, they are wearing Jani-King's 'hat,' rather than the hat of their own distinct businesses," and they note that Connecticut's wage laws contains no exemption for franchisors. *Id.* at 20.

In reply, Jani-King emphasizes that it is obligated under the franchise marketing plan to contract directly with cleaning customers to standardize basic services and pricing, but Plaintiffs may "decide whether to accept any account, retain the right to specified account revenue, and, subject to a rarely withheld approval, have the right to solicit new customers and contract with existing customers to perform additional work." Jani-King Reply at 12. According to Jani-King, "[f]ranchise owners who can work without supervision, never supply their personal labor, set their own schedules, and reject any customer account any time are independent contractors, not employees." *Id.* at 13.

The Court disagrees.

Although "evidence of the performance of services for third parties is not required to

prove part C of the ABC test," the inquiry requires the Court to consider the totality of the circumstances. *Sw. Appraisal Grp.*, 324 Conn. at 741. Admittedly, Plaintiffs have provided initial capital investments, have the ability to hire employees, and provide worker's compensation and liability insurance, but Plaintiffs have also pointed to significant evidence that there is a genuine dispute of material fact as to whether Jani-King can satisfy its burden under part C of the ABC test. As franchisees of Jani-King, all of Plaintiffs' cleaning services are provided as part of that franchise agreement for at least the duration of the agreement and one year afterwards, and thus not as part of any distinct business of Plaintiffs'.

First, the third parties for which Plaintiffs provide services are either obtained or approved by Jani-King, and even though Plaintiffs may reject customer accounts offered by Jani-King, there is no guarantee that Jani-King will continue to offer them more work. *See* Luli & Son Franchise Agmt. at § 6.1.2 ("Franchisor [Jani-King] does not guaranty that the Initial Business will reach or remain at the level stated on the Franchise Summary throughout the term of this Agreement.").

Second, even if Mr. Muharremi and other Plaintiffs may have business cards, those business cards do not indicate that Plaintiffs hold themselves out as independent businesses. *Compare* Ex. 19: Luli & Son LLC Business Card (noting that it was an authorized franchisee of Jani-King, and including Jani-King's logo), *with Sw. Appraisal Grp.*, 324 Conn. at 839 (listing as one factor in the part C analysis "whether the putative employee holds himself or herself out as an independent business through the existence of business cards, printed invoices, or advertising").

Third, all advertising and marketing must meet Jani-King policy.

Fourth, in conjunction with this, services are not performed solely in Plaintiffs' names,

because of the marketing limits and the fact that Jani-King negotiates the customer contracts.

Fifth, and perhaps most importantly, Plaintiffs do not provide cleaning services for or through any other entity besides Jani-King.

This Court has previously held that "Connecticut law does not foreclose the possibility of a franchisee also being an employee." *See* MTD Order at 13. Here, there is a genuine dispute of material fact as to whether Plaintiffs have independent business enterprises in commercial cleaning outside of their work for Jani-King.

Accordingly, there is a genuine dispute of material fact in their favor as to parts A, B, and C of the ABC test, so the Court must deny summary judgment on that basis.

## B.    The Elements of Plaintiffs' Unjust Enrichment Claim

Even if a reasonable factfinder could conclude that Jani-King unlawfully misclassified Plaintiffs as independent contractors instead of employees under § 31-222(a)(1)(B)(ii), there still is another outstanding issue with respect to Plaintiffs' unjust enrichment claims: whether there is a genuine issue of material fact as to their entitlement to relief.

Unjust enrichment is "a broad and flexible remedy," "[w]ith no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable." *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (2006). In order to recover for unjust enrichment, a plaintiff "must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Id*.

"A claim for unjust enrichment is an equitable claim. In matters of equity, the court is one of conscience which should be ever diligent to grant relief against inequitable conduct, however ingenious or unique the form may be." *Town of New Hartford v. Connecticut Res. Recovery*

*Auth.*, 291 Conn. 433, 459 (2009). In analyzing a claim of unjust enrichment, the Court must "examine the circumstances and the conduct of the parties" and determine "what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable." *Id.* at 451 (internal citations and quotations omitted); *see also Greenwich Contracting Co., Inc. v. Bonwit Constr. Co., Inc.,*, 156 Conn. 123, 130 (1968) ("[T]he word 'unjustly' as used in the equitable maxim that one shall not be allowed unjustly to enrich himself at another's expense means unlawfully.").

"'Although unjust enrichment typically arises from a plaintiff's direct transfer of benefits to a defendant, it also may be indirect, involving, for example, a transfer of a benefit from a third party to a defendant when the plaintiff has a superior equitable entitlement to that benefit.'" *Geriatrics, Inc. v. McGee*, 332 Conn. 1, 25 (2019) (quoting *Town of New Hartford*, 291 Conn. at 468). The standard for alleging a defendant's indirect benefit is "highly restrictive," and "the plaintiff must prove that it has 'a better legal or equitable right' to the disputed benefit than the defendant." *Id.* (quoting 2 Restatement (Third), Restitution and Unjust Enrichment § 48 at 144 (2011)). "The plaintiff must prove that its right is both recognized, and accorded priority over the interest of the defendant, under the law of the jurisdiction." *Id.* (internal citations and quotations omitted).

As the Court noted previously in allowing Plaintiffs' unjust enrichment claim to survive, "Plaintiffs conceivably could prove that the parties' underlying agreement was an employment agreement that conditioned initial or continued employment on payment of a down payment or any number of other fees and is therefore void as a matter of law." *Mujo*, 307 F. Supp. 2d at 51.

As a preliminary matter, Jani-King argues that Mr. Mujo's claim is time-barred, because he paid his initial franchise fee on July 11, 2007, but did not file this action until December 5,

2016. Jani-King Mem. at 35. According to Jani-King, any payments made before December 5, 2010, which is six years prior to the filing of this lawsuit, is time-barred. *Id.*

Plaintiffs contend that although Mr. Mujo paid his initial down payment in 2007, he continued making payments of various other fees to Jani-King until he ceased working for them in 2016. Pls.' Opp. at 40. Because these fees were paid continuously into the relevant timeframe, Plaintiffs argue Mr. Mujo's claims are not subject to dismissal. *Id.*

The Court agrees.

Jani-King did not raise the statute of limitations issue in their Answer or in their prior filings. *See, e.g.*, Mot. to Dismiss, ECF No. 45 (Mar. 30, 2017). They cite to Connecticut law that provides that "[n]o action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues, except as provided in subsection (b) of this section," Conn. Gen. Stat. § 52-576(a). But Jani-King only argues that "some courts have held that under a court's equitable powers, a court may provide a remedy (in unjust enrichment) even though the governing statute of limitations has expired." *Corbett v. Petrillo*, 2008 WL 726373, at *4 (Conn. Super. Ct. Feb. 29, 2008) (citing *Vissa v. Pagano*, 2005 WL 1088926, at *3 (Conn. Super. Ct. Apr. 2, 2005), *aff'd*, 100 Conn. App. 609 (2007)). In this case, the relevant date is the last date when Mr. Mujo continued making payments of various franchise fees to Jani-King. Because Mr. Mujo continued providing cleaning services to Jani-King until early 2016, he necessarily made the monthly payments at issue in the unjust enrichment claim throughout this time as well. Because his lawsuit was filed the same year, on December 5, 2016, there is no statute of limitations issue and the claims fall within the minimum six-year limit.

Accordingly, the Court will not dismiss Mr. Mujo's claim for unjust enrichment on this

basis.

Next, Defendants argue that any fees allegedly paid by Plaintiffs could not constitute unjust enrichment. As an initial matter, they note that any franchise fees were authorized under Connecticut law and therefore, could not be void as a matter of public policy. Additionally, any other fees could not constitute "wages" within the meaning of Section 31-73(b) because "revenue designated as 'fees' by Plaintiffs' franchise agreements flows directly to Jani-King under contracts with third parties (i.e., cleaning contracts)." Jani-King Mem. at 35.

Plaintiffs argue, however, that "the franchise fees explicitly require cleaning workers to pay large sums in exchange for cleaning work in violation of public policy." Pls.' Opp. at 38 (citations and footnote omitted). And, as Plaintiffs argue, "[b]ecause they have to pay so much money upfront to obtain their cleaning work, the franchisees must keep working for Jani-King to earn back the money they have been paid." *Id.* at 39. In addition, Plaintiffs argue that "[o]ther ongoing fees such as insurance, advertising, accounting, and technology fees, also must be paid as a condition of continued employment, or Jani-King has the right to terminate the franchise." *Id.* (citation omitted).

The Court disagrees.

At this stage of the case, Plaintiffs must do more than "state[] a plausible claim for relief" to survive a motion for summary judgment. *Compare Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."); *with Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphasis in original)). And, as the Court stated in its motion to dismiss ruling, even if the franchise

agreement is an employment agreement, it does not follow that any payments under the franchise agreement are "in violation of public policy," as Plaintiffs argue. Indeed, "[b]ecause the various fees deducted from Plaintiffs' compensation were provided for in the franchisor-franchisee agreement entered into by the parties, Plaintiffs' claim for relief under § 31-71e fails as a matter of law." *Mujo*, 307 F. Supp. 2d at 50.

Now, the Court also stated that "even if these fees are not wages under § 31-71e, *Mytych* [*v. May Department Stores Co.*, 260 Conn. 152 (2002)], leaves open the possibility that the fees and deductions required under the Agreement may nonetheless violate public policy." *Id*. at 51. As a result, under § 31-73(b), "Plaintiffs conceivably could prove that the parties' underlying agreement was an employment agreement that conditioned initial or continued employment on payment of a down payment or any number of other fees and is therefore void as a matter of law." *Id.*

But in order to have a viable claim, Plaintiffs must do more than show that the franchise agreement is an employment agreement and then conclusorily assert that any fee or payment required by the franchise agreement is void as a matter of law. As an initial matter, and as indicated above, the Court already rejected that argument when it dismissed Plaintiffs' § 31-71c wage claim. *See Mujo*, 307 F. Supp. 2d at 49-50 ("At oral argument, Plaintiffs nevertheless argued that these deductions, wholly consistent with the parties' franchisor-franchisee agreement, violate § 31-71a(3) because the parties' agreement should be rendered void as a matter of public policy. The Court disagrees."). As a result, to the extent that Plaintiffs' § 31-73(b) claim rests solely on the already rejected notion that the franchise agreement violates public policy, that claim fails as a matter of law. *See, e.g.*, *Hartford Elec. Supply Co. v. Allen-Bradley Co., Inc.*, 250 Conn. 334, 368-370 (1999) (affirming trial court's decision, which

emphasized "the public policy of Connecticut to promote fairness among businesses behind the franchise act"); *see also* Conn. Gen. Stat. §§ 42-133e – 42-133h (detailing regulation of franchises in Connecticut).

Based on this record, Plaintiffs' § 31-73(b) claim rests solely on the franchise agreement being an employment agreement in violation of public policy. As they have argued in their opposition, "the franchise fees explicitly require cleaning workers to pay large sums in exchange for cleaning work in violation of public policy." Pls.' Opp. at 38 (citations and footnote omitted). They also argue that "[b]ecause they have to pay so much money upfront to obtain their cleaning work, the franchisees must keep working for Jani-King to earn back the money they have been paid." *Id.* at 39. Additionally, Plaintiffs submit that "[o]ther ongoing fees such as insurance, advertising, accounting, and technology fees, also must be paid as a condition of continued employment, or Jani-King has the right to terminate the franchise." *Id.* (citation omitted). Finally, Plaintiffs argue that Jani-King's practice of deducting "charge-backs" from Plaintiff's gross revenue is also violative of public policy. *See id.* at 39-40 ("A 'charge-back' occurs when a customer fails to pay Jani-King for work already performed by [P]laintiffs.").

Plaintiffs, however, have provided no basis for distinguishing their claims for relief from legitimate fees within the franchise agreement, which the Court must presume exists, given the applicable caselaw. *See Mujo*, 307 F.Supp.3d at 50 ("This Court therefore 'must enforce the contract as drafted by the parties and may not relieve [Plaintiffs] from anticipated or actual difficulties undertaken pursuant to the contract.'") (quoting *Geysen v. Securitas Sec. Services USA, Inc.*, 322 Conn. 385, 392 (2016)).

Put another way, under the Plaintiffs' view of the law—at least on this record—the franchise agreement has no value and any fee paid by them to Jani-King is "necessary to secure

employment or continue in employment." *See Mytych*, 260 Conn. at 166 ("The Appellate Court properly concluded that the language of § 31-73(b) was clear and unambiguous in that it prohibits an employer from demanding 'any . . . sum of money or contribution from any person . . . upon the representation or the understanding that such . . . sum of money . . . is necessary to secure employment or continue in employment.'"). But franchise agreements are not *per se* invalid under Connecticut law, *see* Conn. Gen. Stat. §§ 42-133e – 42-133h (detailing regulation of franchises and franchise agreements under the Connecticut Franchise Act); *see id.* § 42-133e(b) (defining "franchise" as "an oral or written agreement or arrangement . . ."); and therefore must have some value.

Plaintiffs, however, have failed to identify that value or conversely, identify the fees that have been added beyond that value. *See Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 285 (1994) ("Where damages are appropriate but difficult to prove . . . all that can be required is that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation which will enable the trier of fact to make a fair and reasonable estimate."[5] (internal citation and quotation marks omitted)); *see also* Luli & Son Franchise Agmt. § 4.3 ("In consideration of the franchise herein granted . . . and the initial services to be performed by Franchisor in connection with Franchisee's use in the Territory of the System, Property Marks and Confidential Information . . . Franchisee shall pay the [Initial Franchise Fee]."); *id.* § 4.1.2 ("Franchisor has developed and used, and continues to develop, use, and control in connection with its System certain Proprietary Marks [i.e. all trademarks,

---

[5] In *Hartford Whalers*, the Connecticut Supreme Court affirmed that the trial court had sufficient evidence to determine a remedy for unjust enrichment for advertising and merchandising services "based upon a contract price on the same order as the price that they had paid the previous year for a less extensive advertising program, and based upon the same price that Brass City, which the defendants had designated to sign the contract for the year in question, had agreed to pay." 231 Conn. at 286.

trade names, trade dress, service marks, slogans, and logos] that have become associated with its System so as to impart to the public superior standards of quality and service."); *id.* § 4.5.2 ("Franchisee agrees to pay Franchisor an advertising fee . . . [which] will be used by [Jani-King to] . . . direct all advertising programs . . . satisfy any and all costs of maintaining, administering, directing, and preparing advertising . . . defray any of [Jani-King's] administrative costs incurred in activities reasonably related to advertising programs."); *id.* § 4.8 ("Franchisee agrees to pay . . . an accounting fee . . . to cover Franchisor's administrative costs and expenses for this service.").  As a result, this record lacks the evidence necessary to create a genuine issue of fact as to their entitlement to relief on their §31-73(b) unjust enrichment claim.

Accordingly, the Court will grant summary judgment and dismiss Plaintiffs' unjust enrichment claim.

## IV.     CONCLUSION

For the foregoing reasons, Jani-King's motion for summary judgment is **GRANTED**.

The Clerk of Court is respectfully directed to close this case.

SO ORDERED at Bridgeport, Connecticut, this 21st day of December, 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE